Thank you. Okay, the next argued case is No. 16-2198, In Re CFRD Research, Inc., against, in this case, defended by the director. We appreciate the next three cases are related, so let's take whatever time we need to present the situation here. So please proceed, Mr. Fahmy. Thank you, Your Honor. May it please the court. Your Honors, as Judge Newman just mentioned, this is the first of three cases involving the same patent that you're going to hear, and the issue in this particular appeal was the question of anticipation by the Fann-San Jose reference. In this opinion, the board concluded that Fann-San Jose teaches the specifying step of Claim 1, and they reasoned that the specifying step need not take place before the discontinuing step, and then surmised that in Fann-San Jose, the second device would be specified when the user takes some action on the second device to resume a session. This is at page 15 of the board's opinion. Do you agree that the analysis of the pull mode as opposed to the push mode needs to be different? Yes, it does, Your Honor, because Fann-San Jose distinguishes between those two modes, and there's no dispute that the push mode of Fann-San Jose does not anticipate the claim because it doesn't provide the correct sequence of the step. The only question that remained both at the board and before this court was the pull mode, and whether the pull mode would anticipate the claim. I think the starting point and where your arguments seem to fall down is what the board found was necessary in the claims. In other words, they said there's nothing in the language of the claim expressly specifying a second device to take place before discontinuing said session on said first device. In other words, they did find that certain things as a matter of logic had to occur before other items, but they specifically found that as to that point, there is no description in the claims that requires a specified order. You're right, Your Honor, that's what the board found, and yes, it would have been easier for our position had the board found that the sequence was as laid out in the claim, but I don't think the inquiry ends there, as your question suggested, because... Okay, so you're not going to argue to me that you think that the sequence is different from what the board described?  Okay. What I am here to try to convince you of is that there's nothing in FAN San Jose that supports the board's inference that there's any specifying as required in the claim that takes place. What the board articulated, and this is page 17 of their decision, is that the middleware server in FAN San Jose must somehow receive enough information from the second device in order to be able to distinguish that device from other potential devices. This is how they got to the conclusion that there was a specifying taking place. In fact, there's nothing in the FAN San Jose reference that would lead to that conclusion, and really, the board missed the point by going in that direction. The CFRD position was never that, well, the server doesn't know where to send the information. The CFRD position was that really specifying in the 233 patent is akin to designation, identification in a clear and distinct fashion, and that that's what was missing. If you look at the specification throughout the specification of the patent, the specifying step is equated with the notion of selection from a list. This occurs in... All right. You need to show me where, because the board found that there was nothing that was so limiting. The board actually highlighted at least one portion of the specification, and this is at page 10 of their decision, in the first full paragraph. They say that the specification discloses that the client software may be configured to provide a selection of devices that the transferring session may be redirected to. Right, but they said that that's not the only mechanism. Well, they're mistaken on that point, Your Honor. In fact, that is the only embodiment that is described in the specification. It's described... But they describe them as exemplary embodiments. Yes. The patent uses the term exemplary, yes. But it doesn't describe anything else that might be an example. Repeatedly refers back to this idea of selection. It does so beginning at column two, lines five through six, when it first... Okay. What about... I mean, I know sometimes these are boilerplate words, but you end up getting stuck with them. I mean, it says that, although the method of the present invention has been described by examples, the steps of the method may be performed in a different order than illustrated or simultaneously. How do you get around that? We're not trying to get around it, Your Honor. The board reached the same conclusion, and as I mentioned a few moments ago, I'm not here to tell you that somehow we're arguing the sequence of events. We're not. We're arguing that the specification step is missing in Fan-San Jose. This was actually consistent with the expert testimony that was provided in the case. Dr. Mohapatra, this is at page 400 of the appendix, indicated that in Fan-San Jose's poll mode, there's no need for specifying because what's happening in that particular instance is the user is suspending the session. User's done. So there's no need to identify, to select from a list, as happens in the poll mode, this second device. When you have a broadening statement in the specification, or at least a statement that looks as if it's intended not to be limiting, whether it's broadening or not, at this stage, wasn't there at least an opportunity to restrict explicitly the scope of the claim, or here we have a fuzziness, at least, actually, it's quite explicit that there's no intention, it seems to me, to limit the order. If that turns out to be dispositive in terms of anticipation as concerned, in theory, isn't there an opportunity to eliminate that possibility from any claim construction? I would have to agree, Your Honor, that the best time to eliminate any issues is during the prosecution. I mean, I can't deny that. Otherwise, with the broadest reasonable interpretation, an explicit statement in the specification that we're not limited to any order, nevertheless, you're requiring us to construe it otherwise. I'm not, Your Honor. Again, I'm not arguing order of steps. The board was quite clear that order of steps, at least when it comes to specifying the second device and then starting the session again on the second device, that that order is not implicated by the claim. I'm not suggesting that we're arguing the sequence of events. What I'm saying is that in FAN San Jose, the single reference that was used for anticipation, there is no specifying step as recited in this claim. There is no specifying step because why? Not because of the order, right? Not because of the order. So you're saying not because of the order, but because of who or what is doing the specifying? Correct. But again, so all you have is two exemplary embodiments, but nothing in the claim that says it must be done by a particular thing or a particular user, right? We're sort of, I think in your question, Judge O'Malley, just sort of mixing notes between the prior reference and the patent. So to be clear, in the patent, the claim doesn't specify who does the specifying and I've just mentioned now several times, sequence is not the issue. But in FAN San Jose, we'll go back to originally what we were saying, there are two embodiments. In the push embodiment, which the board agrees does not anticipate and there's no intimation by the director that the push embodiment anticipates. In the push embodiment, there is a selection of the target device. This is clearly shown in FAN San Jose in Figure 5. But in the pull embodiment, the one that is issued before the court now, there is no such selection. All that happens is the user suspends their session and at some later time, the second device comes along and asks the server. What does it just come along? I mean, basically the PTO said this argument, suspends credulity, right? Because somebody has to log in to get the second device to pull it up. That was our whole point, Your Honor. Somebody logs in and identifies the user. They don't identify the device. It's the user to whom the new session is directed. The user can be at any device. Doesn't have to be a specified. It is sending it to that device. It's pulling it to that device. Yes, the board went through the same discussion. Our point was never that the server doesn't know where to send the information. At some point in time, it has to know where the information is going. The point was that there is no particular identification, no designation of what that device is. All that is identified is the user through the board surmise that there was some kind of log in process that would be needed. If you look at Fan Helsinki, Fan Helsinki is not really before the court in this case, but we're going to talk about it this morning. It's the same author and it's the same system. Fan Helsinki makes clear that, yeah, it's a log on process that is taking place in the poll mode. What happens is the user provides a user ID and is then allowed to download the session. It's the user that is, if you like, specified, not the device, in the poll mode. That is the mode that really this court is confronted with. I see I'm well into my rebuttal time, Your Honors. Let me just conclude by saying that. Tell us what you need to tell us, because at least if it's reasonably correct that the issues are similar in the next appeal. Thank you, Your Honor, I appreciate that. There is mention in the board's decision about an example that is provided in Fan San Jose. That is the example of a physician that is beginning some interaction with medical records on his or her PDA and then wants to review those same records on the desktop. We're told that the physician stops the session on the PDA and then resumes the session on the PDA. This whole IMESH system that is discussed in the Fan references was instantiated for this type of medical records review. It was done at UCLA. The example that's provided is not surprising, because that's the target audience they had in mind. With that example, Your Honors, there's no discussion of how the physician actually resumes the session. In fact, the hallmarks, very little is said, actually, about how this is done. Really it was the figures that the board was referring to. This is on page 344 of the appendix, and you recall it was this sort of succession of these three figures at the top of the page. The text that goes along with that in the right-hand column, if anything, has hallmarks of a PUSH session, because we're told that the session history is automatically sent to the second device. That is a hallmark of what happens in the PUSH case, not the PULL case. With that, Your Honor, unless you have questions, I'll reserve any remaining time for rebuttal. Thank you. We'll save you a little rebuttal time. Ms. Kelly. Good morning, Your Honors. May it please the Court. Ms. Kelly, before we get started, I know that you're only here for the first case, but since we have you, I need to ask a question that's a big-picture question. Okay. Hopefully I can answer it. Assuming we agree with you on the first two cases, so if a patent claim is invalid, it's       If it's not, it's not. If it's not, it's not. If it's not, it's not. the world, right? Right. So, with respect to the third case, claims 1, 4-6, 8-11, 23-25 are all invalid as to Hulu, Netflix and Spotify in the third case if they are invalid in connection with the first two cases for different reasons. I would assume so. I haven't actually, to be candid, I haven't compared what claims are at issue in this appeal versus those next two appeals. So my numbers, I think my numbers are right, but even if my numbers are wrong, that that's what logically flows, correct? Logically, every claim that is found invalid in this case is invalid for the other two. Right, as long as they're the same. But, again, I haven't done that comparison. I am sure that these appellees have done that comparison. And I will ask them what's left and what the distinctions are. Okay, but in the third case where all of the claims were upheld, how does the office justify? Here we have issues where questions of fact, there was anticipation, so that we look for the idea that substantial evidence supports the finding of invalidity, and then in another case substantial evidence supports a finding that they're not invalid. I would assume that it's different prior art that's at issue in those cases. And therefore, here we have the public now, we have an estoppel flowing from each of these cases, and we have to cope with this conflict which they are barred from challenging in the district court. Can it be that this is what the legislature's had in mind in the America Invents Act, that the same panel of the PTAB can reach a conflicting, a different decision on a question of fact, and have it sustained and subject to estoppel in an infringement suit? I would say that that's an impossible concept. So where is there no obligation, no mechanism whereby the office, when it receives challenges against the same patent, let's say different petitioners, can somehow consolidate the issues and reach a unified judgment? Or is that left entirely for us, the only announced review in court, which nonetheless is supposed to give deference to findings of fact? These are close questions. So what's the answer to that? Legislative change, or what? I don't know that there's necessarily a problem here, and I believe that Congress probably  There's a problem in this case? Well, I believe... It needs to be affirmed. These are questions of fact. So we have invalidity is affirmed, and validity is affirmed. Validity and invalidity as to specific prior art, and specific prior art rejections. It's the... But the estoppel applies to the issue. You can't go back in the district court and say, I've got another reference. As to that particular petitioner, that particular petitioner would be estopped from raising an invalidity issue. Yes, that is true. And I don't think that's problematic, because we have petitioner two or three or four here who can bring other prior art. That's the same with a re-examination. Can I help you out maybe? Is it that in each case, you're just deciding whether that particular petitioner is satisfied, it's burden of proof on that particular prior art? Yes. And if you say that it's invalid as to this prior art, and you say it's not invalid as to this prior art, ultimately that'll be up to the district court to do what I was starting to do when you first stood up, which is to say, certain of these claims don't matter, because there's already an invalidity finding from them. Right. If you agree with the board that in this case, these claims are invalid, all of this other litigation goes away at district court, and the other PTAB decisions just become moot. It all becomes moot if this... For sure as to those claims identified, and we'll see what they say as to the other. Yes. That certainly seems extraordinary that the same three judges on the same panel of the PTAB look at the same claims and say these claims are anticipated in one case, and not anticipated in the other case, and have that judgment affirmed. Right. And that this, therefore, that the patent nonetheless survives for another reference in another case, again, this seems to be so contrary to the purpose of the American Vents Act to have the experts decide the technological questions as to the technology. Your Honor, in the inter-parties cases, the experts are deciding, as you've termed the PTAB, they're deciding on the issues of validity raised by the petitioner as to that particular IPR. Even they know the claim is invalid in the case that they're going to take up the next day. Well, that is the point of the American Vents Act. Congress wanted these proceedings to go very quickly. But they said every issue raised, or that could have been raised. As to that one particular petitioner. And therefore, there's a finality, but you're saying there's no finality as to the next guy. So how is the public to also to know that they can't rely on anything that comes out of the PTAB? I would say it's no different than ex-parte re-examination. An ex-parte re-examination... It's intended to be quite different. There's no estoppel in the district court, for instance. Well, isn't that the whole idea? We've always had ex-parte re-examination. Here we've got a whole bunch of new inter-parties contests and opportunities, removal of the issue from trial. Permanent estoppel can't be raised if... And we're obliged to defer, nonetheless, so that there's nothing in the question of fact. There's no real fresh look. So you get the conflicting judgments that we have here. Even in the pre-AIA inter-parties re-examination, where there was an estoppel effect, if we look back to that older statute, the pre-AIA IPR, even if we looked to that, in that situation where there was an estoppel, just like an ex-parte re-examination, you could have a patent that had been examined or re-examined multiple times. And in one, maybe in the first re-examination, upheld as valid over certain prior art, and then re-examined later and found invalid over other prior art. And we have said, in the context of a self-contained IPR, that the PTO is not allowed to create or consider arguments not raised by the petitioner. Right. And in that way, it's vastly different than ex-parte re-examination. Because the director doesn't have the discretion to institute its own inter-parties re-examination, whereas in ex-parte re-examination, the director has its own discretion. And even in... And it's an adversary proceeding where it's what the petitioner raises. Right. Because there's not a true examination going on there. These application... The inter-parties re-examination, the patent doesn't go to the central re-exam unit. It's not being examined by examiners to see whether the patent might be invalid under other non-cited prior art, as would be the case in a straight up ex-parte re-examination. And to... Well, I'll stop right there. But I just wanted to circle back for a moment to the issue that is before this court in this particular case. In this particular case, neither the claims nor the specification of CRFD's patent define how the second device is to be specified. And I just wanted to address two points raised by my friend across the aisle here. One is, the passage that my friend cites from the specification, the passage cited by the board, that that is the case. If you continue reading that full passage that the board cites from line... We're at column four, appendix 33, column four, lines 58 through 61, the specification also teaches that the selection of the redirected device may also be forwarded from the user of a wireless or wired client device and to the session server. In other words, this specification, and again, the same sort of teaching is provided at column eight from lines 30 through 36, the specification expressly teaches that the user logging on to the second device is capable of identifying or specifying what the second device is without anything more. And so, I get the feeling that your honors have already a clear idea of where they're going on specifying the second device. I guess the piece that they're probably pushing the hardest, or at least one of the ones that they're pushing the hardest, is that in anticipation, you've got to have all of the limitations and they've got to be in the same order as in the claims. And they're saying that you basically, I'm not sure it's inherency, but you're saying it's logical that in fact somebody's logging on to pull to the other device. And they're saying that there's nothing that is explicit that says that. And that all they're doing is logging on and identifying the user, not identifying the device. Again, though, there's nothing in the specification that says you have to do it that way, that you have to provide a URL address for the device. And in any event, we know that in fact somehow that second device is specified because that information from the first session that's sitting there on the middleware server isn't transferred to all of the devices in the hospital. It's only transferred to the second device that the user logs on to. But is it defining what it's transferring itself to by reference to the user or by reference to the device? The claims, we don't know for sure. It could be either. The board found that it could be either. We do know that it does occur. Their claims certainly don't require it. And their specifications certainly, if you look at the passages that I pointed your honors to, don't require that. In fact, they seem to suggest that you could do it exactly the way FAN does it. So we're left with this case where CRFD just wants to say, here's what specifying isn't. They're not willing to say what specifying is or must be. And when the board pressed them on this at oral argument, they said, oh, you need to provide a URL address for the second device. There is nothing like that in their specification. And there's certainly nothing like that in their claims. If they wanted that to be the case, if they wanted their claims to be construed that way, they could have and should have amended their claims to recite specifying the second device by providing or so on. Well, but I'm not so sure, unless the statistics have changed. My understanding is that requests to amend are almost invariably denied. I believe that that is changing, your honor. A little bit. So instead of 95% being denied, only 80% are being denied. There's still no attempt here by the CRFD to make even an attempt, I guess, to do that. I would suspect that they would lack written support for amending their claims that way, given that their specification requires nothing like that. It doesn't even discuss a situation where you identify the second device by providing a computer address. And to the extent that a CRFD may be arguing that the user has to knowingly or intentionally identify the second device, that sort of argument was recently rejected by another panel of this court, admittedly, in a non-precedential decision in BE Technologies versus Google. That was appeal number 2015-1827. In that case, the court was looking at the board's construction of a limitation for transferring a copy of said software to the computer in response to a download request by the user. And the board found it to mean sending a request for downloading data from the user's computer to the server. And the board specifically rejected the proposition that the user had to knowingly... I'm sorry, a panel of this court decided that there was no requirement in the claims that the user knowingly download the software or do anything other than log on, enter their username, and then have a transfer of software occur. That's really what's happening here. Instead of downloading software, we're just downloading the session history from the first device. I see that I'm out of time. Well, tell us what you need to tell us because at least my sense is that there's a certain overlap, at least with the next appeal, and we extended the argument for the petitioner. Well, thank you. I really just wanted to wrap up and conclude. The claims here very clearly, and an opposing counsel has admitted, they don't say how, who, or when that specifying second device needs to take... How, who, or when that specifying is to be done. And the specification doesn't do it either. And in that situation, we have FAN, we very clearly know that when that user logs onto a second device or a third device, that information is downloaded from the middleware server to the second device. It happens, it occurs. I really don't think it's inherency. I think we know it happens, we just don't know the details of how it happens. But to the extent that that's not persuasive, then inherently we know it happened. And that's what's in all fours of the claim here. And for that reason, I think this court should affirm the board's decision. If there are no further questions, I'll sit down. Okay. Thank you, Ms. Kelly. Mr. Fahmy, let's have some rebuttal in this case, and then we'll turn to the next one. Thank you, Your Honor. We won't eat up all your rebuttal, but do you agree that if we affirm in the first case that, at least as to the second case, the second appeal is effectively moot? Um, no, Your Honor. There are different claims at issue. I thought there was a direct overlap in those claims. No, there isn't. In this appeal, it's plain. So let's rebut on this one, and then we'll discuss mootness of the next one. Very good, Your Honor. I wanted to address a couple of items that my learned colleague has just said. Uh, as she was wrapping up, she indicated that with respect to Fan San Jose, we don't know the details of how this happens. Well, that's our point. Fan San Jose, when it comes to the poll mode, doesn't specify the details. Um, and there's nothing in Fan San Jose that suggests there is a specifying of the second device that's going on. Judge O'Malley correctly noted that anticipation is a very technical issue and requires that it's a single reference that describes each and every limitation set forth in the claim in the order that they're set forth in the claim. And I would just remind you that even claims that were directed to a color photocopier have been found not to have been anticipated by prior references that teach color printers. That's the Trintec decision, 259 Fed Third 1292. Your Honors, in this case, there is no identity that would be required for anticipation. Fan San Jose's poll mode does not teach the specifying step, and instead it allows any second device on which a session is reserved to retrieve the session state from the middleware server. This is spelled out in the reference pages of the appendix 393 and 394 where it's indicated that unlike the push mode, in the poll mode, no specifying of the target device is taught. If the user wants to resume the session, an unspecified device can pull the session state. This was the expert testimony in the case. Neither the board nor the director has pointed to any text in Fan San Jose that would suggest the opposite, and instead they've merely speculated about how a second device might retrieve a session state. With respect to the portions of the specification that my colleague pointed out, if anything, I think this makes our point. The passage in column four that was referenced required the user to designate the device on which the session was going to be resumed. That teaches the specification. Again, this does not happen in the Fan San Jose poll mode. Unless there are questions, we'll commit the matter to your sound judgment. Okay, so in this case, taken under submission, you may stay at the podium or return.